All right, we will hear next on Diagnostic Leasing, Inc. v. Associated Indemnity Corporation. We'll begin with Mr. Ambler. Hello? Hello, may you please report? Can you hear me? Yes, we can hear you. Thank you. You may proceed. Okay. I wasn't sure that you had the audio. I just wanted to verify that before talking and finding out that no one was hearing anything I said. You're all set. You can proceed. Thank you. Okay. Thank you very much. May it please the Court, Kevin Ambler here on behalf of the appellant. We are here to take up the issue of the Court's granting of a motion for summary judgment by the insurer on a bad faith claim brought by Diagnostic Leasing. The appellant has sued in two capacities. One, it sued as a claimant for a third-party bad faith cause of action for the manner in which the insurance company failed to settle the claim when it had a reasonable opportunity to do so and should have done so. Secondly, Diagnostic Leasing had sued for, in its capacity, as an assignee of the insured blocker transfer and storage. And as the assignee of the insured, Diagnostic Leasing was asserting the insured's third-party bad faith rights, not first-party rights, but third-party rights as the insured under the Florida Bad Faith Statute 624.155. Because my time is so limited today and to cut to the chase, I want to get to what I think, and unless the Court has specific questions regarding the ruling, I would like to cut to the heart of the matter, which I believe is the last 10 pages of the Court's order granting summary judgment. And in that instance, I want to go directly to the points I would like to argue, which are the issue of whether the Court erred in finding that the release that was signed by blocker with FFIC, which is an abbreviation for Fireman's Fund Insurance Corporation, in connection with a declaratory relief action that was filed in 2000 after the initiation of Diagnostic Leasing's underlying cause of action for the fire loss of its CAT scanner in 1999, whether the settlement release that was entered into for the separate declaratory relief cause of action between the insured and the entity, Fireman's Fund Insurance Corporation, constituted a release of the appellant, who was the underlying defendant, insurer of blocker in this case. The starting point has to be before discussing the specific facts that apply here that, and I'll just say at the outset that the appellant agrees for the most part with the findings of facts that are recited in the Court's order, which granted the summary judgment, where the appellant takes issue is, and what deviates from the standards required for summary judgment to be granted, is that with Associated Indemnity Corporation, the appellant, which I'll be referring to as AIC, and for short, I'll be referring to the appellant as DLI to make the designations clearer. The obligation on the moving party for summary judgment, which was AIC, was to prove an absence of evidence, an absence of the evidence that there was a disputed issue of fact, and only if they have met that initial burden does the burden switch or shift over to the appellant DLI. It is DLI's position in this case that the Court clearly in its own ruling has indicated that AIC failed to meet its burden in the two instances of both the sub-issue for the release is whether AIC was an agent of FFIC, and the second issue is whether the release of FFIC, even if AIC is an agent or considered to be an agent, or even if the Court were correct that there's sufficient evidence to support AIC as an agent of FFIC, whether it extinguishes DLI's third-party claim under the statute as a separate cause of action as a wrong party, an injured party, under 624.155 1B1. First, with respect to the issue of release, let me go through this very quickly and state that specifically the Court begins its discussion on page 28 of its order, which is in the record ID 12345. The question is whether the evidence establishes that AIC was the agent of FFIC, and the Court correctly recites the elements of agency on page 29. It says to establish an actual agency relationship, the following elements must be established. One, acknowledgment by the principal that the agent will act for him. Number two, the agent's acceptance of the undertaking. Three, control by the principal over the actions of the agent, and the Court cites to the case of Fernandez v. National College, Inc., a third DCA case from 2006, and the Court goes on to cite that it is the right to control rather than the actual control that may be determinative in the Millicent case. And generally, the existence of an agency relationship is a question of fact to be resolved by the fact finder. So by the Court's own acknowledgment, this is typically going to be, the issue of this agency is going to be a question of fact. Yet, nevertheless, the Court goes on to make a finding that AIC did not address the elements of agency in its motion for summary judgment. I'm sorry, Judge Locke is trying to I'm sorry, I could not hear. And I apologize. I've rarely been accused of not being loud, but I may not have been there. Okay. Wasn't there some evidence that the elements had been met? In other words, for instance, the District Court specifically cited a docket entry 216 at page 30. I'm sorry, referring to docket entry 122-15 at three, and also very similar letters at 22-6 and 122-10. The letters written by with FFIC letterhead that was sent to Blocker stating that AIC had received the complaint and would provide a defense to Blocker. Isn't that evidence of control and of acknowledgement by the principal that the agent would act on their behalf? No, Judge Locke. I would suggest that at best it's dubious, and it raises a disputed issue of fact as to exactly who is in control. The letters cited by the Court... How is that a dispute? I mean, there may be other evidence, but it speaks for itself. It's on letterhead by FFIC, and it's saying that we've gotten everything, and we're telling you that AIC is going to be doing these things on our behalf. Well, therein lies the dubious aspect of the facts, even on the face of the evidence, because as the Court acknowledges in a statement of facts, which the appellant does not disagree with, that Fireman's Fund... Now for two-minute warning. Thank you. Fireman's Fund is a moniker for a group of companies all operating under the moniker of Fireman's Fund. The Fireman's Fund is a moniker that also includes the company, specifically the sui juris company of Associated Indemnity Corporation, is separate from the company called Fireman's Fund Insurance Corporation. And the letterhead they use simply denotes the generic trade name of Fireman's Fund, which covers the umbrella of companies that all issue separate policies. Among those are Fireman's Fund Insurance Corporation and... I still see how there's different corporate entities would contradict a finding of agency as reflected or as inference from that letter. Doesn't the fact that they're separate indicate that one is the principal and one is acting as an agent? No, I would disagree. First, I'll come back to the initial premise. It was the burden of the moving party to show that there was an absence of evidence to address that. The Court then did its own de novo analysis of the record evidence. It cites the one letter, but those letters... Isn't that what the Court is supposed to do in summary judgment, is review the evidence de novo and determine whether there's a genuine issue of material fact on the essential elements? Well, yes, it does, but it doesn't obviate the responsibility of the moving party to meet its burden of the absence of the evidence, which then shifts that burden to the non-moving party to show that there are... I mean, wasn't the check even made out to Diagnostic from AIC after the appeal of the 1999 lawsuit? And doesn't it show that the heading says Fireman's Fund Insurance Company, and next to that are the words associated indemnity corporation with an address in Alpharetta, Georgia? Well, I think that the fact that the check comes from AIC demonstrates AIC to be the principal, the face of the policy... Counselor, your audio has expired. May I complete the answer? You can finish answering the question. Thank you. Thank you. The policy itself was issued by AIC, and as such, AIC is the principal. Fireman's Fund was acting as the agent for AIC in adjudicating its claims and in processing its claims, which is why in its capacity as the agent of AIC, it was reaching out through its counsel initially to discuss trying to get the matter settled. But AIC ultimately was the principal. That's why the check emanates from AIC and not from Fireman's Fund. If Fireman's Fund were the principal, the check would have been drawn on the Fireman's Fund account as principal, not on the agent's account. So the evidence is dubious at best in raising a disputed issue of fact, and certainly not in absence of evidence that AIC would have met its burden that shifted to... Thank you, Counsel. Thank you. You've reserved five minutes for rebuttal, and we'll hear now from Mr. Campbell. Good morning, Your Honor. This is Dennis Campbell on behalf of AIC. What I'd like to address are really three key issues in connection with this case. First, the focus on the release. Secondly, the issue about the agreed order that was entered into by Mr. Ambler, in which the Hillsborough County Circuit Court entered an order finding that the policy limits were in fact $100,000, which coincides with the location of the fire that we believe was the case. And third, the issue about the preservation of error, which we addressed during the course of our brief. But let me first address the release and the evidence that deals with the agency question. First, this release specifically refers to the policy number. The policy itself does have Fireman's Fund's logo on it. It's in the record. It's document 54, you know, page 64 of the district court record. Counsel, this is Robert Buck. It seems to me it's not enough for you to say and to cite evidence that they're related corporations or, quote, unquote, affiliates or they're under the same umbrella. That doesn't really get you the principal agency, in my view. That might get you to piercing a corporate veil. That might get you to alter ego or other theories. But regarding principal and agency, it requires some very specific things. So I want you to tell me not just how they're all under some umbrella and kind of evidence that you presented that was unrebutted showing that Fireman's Fund was a principal, AIC was an agent, and one directed the conduct of the other. Okay. Let me address that, Your Honor. And that's certainly an apt question. First of all, the attorneys that were hired in connection with this case were hired by FFIC. That was Ms. Roth, who was the defense counsel. Her testimony is in the record, and she talks about how she was hired by FFIC. Secondly, the adjusters were actually FFIC employees, and they were the ones that were deeply involved in the adjustment of this claim. Third, the outside adjusters that were involved were also hired by FFIC. Fourth, you've got the policy certification came in by FFIC on behalf of AIC. From the standpoint of that... I missed that fourth one. This is Judge Anderson. I missed that fourth one. The policy certification, there was a request for a certified copy of the policy, and the policy was actually certified by FFIC as opposed to AIC when it was requested by counsel in response to the disclosure statute. It was those instances of control which existed from the beginning of time up to the end of the case. It was the same group of attorneys, at least up to a point. There was a change of counsel, but it was the same situation where counsel was hired, in fact, reported to FFIC. The same thing with the outside adjusters when their term expired in that regard. They were all reporting to FFIC. Same thing with respect to the need to go ahead and respond to requests on behalf of AIC that was done by FFIC. In terms of the actual course of conduct between the parties, that's where I would submit the control exists. Judge Elk, I'm answering the court's question. Let me add this, Judge Anderson. Was AIC a subsidiary of Fireman's Fund? Yes, sir. Let me clarify that. It's both a trade name. Fireman's Fund was both a trade name and was, in fact, a subsidiary. In fact, inherent in that relationship is the existence of a controlled relationship between the parent and the subsidiary. Next question. Even if we disagree with you and think that there might be a genuine issue of fact with respect to the agency issue, it seems to me that it was not preserved by the plaintiff in this case. All and the only thing in this regard, relevant to this agency question, the only thing argued in the district court, at least at the summary judgment stage before the judgment was entered, was that they were separate corporate entities, which is simply, as Judge Lux said a minute ago, a different issue and has no relevance to the agency question. Am I right about that or is there some other argument that I missed? No, Your Honor. I think the court is spot on. That was the only issue that was presented to the district court. That's the only one that they had argued and, yes, it is irrelevant, so I agree with both your comment and that of Judge Lux. And, Your Honor, let me also just continue as it relates to some of the issues in this particular case. What was problematic in this regard from that standpoint is the whole basis for their bad faith claim or the primary basis for the bad faith claim was the fact that there was a dispute over the location of the fire. The particular policy limits that we were dealing with, $100,000, coincided with the fire department report. It also coincided with the investigation and certain of the testimony in the record. They've tried to make some issues about that, but what I found particularly important is when after the trial is over, after this has been through essentially 15 years of litigation and claims and the rest... Counsel, I have to say, and it may be that you're right and you have to disabuse me of this notion, but that does not seem, at least as the district court side, what the underlying litigation was about. The underlying litigation, as I understand it, was the position of Blocker throughout that liability was limited pursuant to their bailment contract with DLI, that their liability was limited to $25,000. That was the position that they took throughout the litigation. It's why they wouldn't settle. As I understand it, it was the district court who found that defense to not be sufficient for whatever... Sorry, the state trial court who found it not to be sufficient and that that was what would allow for the excess judgment. Do I have that wrong? Well, the facts that you are alluding to are 100% correct. Yes, that was the defense. That was what was insisted upon by Mr. Pesco, their independent counsel, and continued all the way up through the time of trial. You could see from the evidence that we pointed to during the brief, they were $25,000 limitation was exactly what it had to be. There was a second problem that I just wanted to point to, and that was the lost profits claim was never covered. It's excluded from the policy, and I would direct the court to page 83, document number 54, page 83, the specific exclusion for lost profits. That's where... Counsel, I agree with you completely, and I understand that, but I guess in saying all this, it seems to me that the location wasn't really the main issue or the litigated issue in the underlying. It was almost taken as a given, frankly, that the limitation was $100,000. Everyone seemed to agree to it that it was $100,000, but that doesn't seem to be the location of where the fire happened, the first fire happened, doesn't seem to have been a significant issue in the underlying 1999 litigation. Do I have that? No, you do have that right. The location has only come up during the course of this bad faith litigation, this statutory bad faith case, and that is what they've been harping on for some time about the fact that there was some suggestion that we got it wrong, that there was some negligence, which again is not the standard for bad faith. So yes, what you say about the underlying litigation and then the current litigation are different in the sense of they seem to have shifted theories. But you go back to your issue about the $25,000, that was clearly what one of the main issues was or happened to be in the 1999 litigation. It was whether or not that limitation of liability was enforceable or not, and thereafter, the only other issue that was litigated in that was the question of the damages, the loss of use, and the lost profits that could have come about. So I hope I'm answering the question. So the point is that it really wouldn't have mattered what the location was because of blockers' position that the damages were limited to $25,000 in any case, regardless of what the policy limit was, right? Yes, that is correct. And that's the reason why they had independent counsel in and why you will note from the record that there was actually a policy tender by the insurance carrier to them saying, look, if that's the position you want to take, here's the $100,000 that you can do with it as you will. And they never offered that money. That was their decision all throughout while Mr. Pesco was deeply involved in the case. And even after he passed, that continued to be the position of the insured. And that was the testimony of the trial counsel who was involved in the case at that point. But from that standpoint, I did want to go ahead and also talk briefly about the preservation of error. The district court really did not have any sort of a presentation in terms of the contesting the agency question throughout. It was only the question of the separate corporations. And that, as we've discussed, is certainly insufficient. I do also want to go ahead and point to just some other facts in the particular case. This is Judge Anderson. I am doubtful that he even raised in the district court the issue that he now raises that the release could not operate because the excess judgment had not yet been entered. I'd like you to address Waver with respect to that issue and also the merits of it. Well, in terms of that being raised, the answer is no, that was not raised, that particular issue. From the standpoint of whether or not the merits of that, once the insured was satisfied, and again, the insured not only assured Mr. Snell testified that it was satisfied with the manner in which the claim had been handled, up through the point of litigation. Ultimately, this release, which was executed in 2001, came about. It didn't matter if there was any excess judgment in place at the time, that goes to the derivative nature of the claims that a third party holds under the statute. That's where this court, I believe in the case called Wald that we had cited in our brief, and in the Rosen and Cope cases, which were Florida Supreme Court cases dealing with the scope of a release, their rights, the third party's rights, are all derivative from those of the insured blocker, and that's why this release is effective. Counsel, does the release put a time distinction embedded in its language? In other words, does it say those claims that exist right now? It does not specifically state that, but from the standpoint of the fact that they were releasing bad faith claims, certainly anything that had accrued up to that point, and I'm going to assume that the court's question is going towards whether or not acts that postdated the release could be released, and I would submit to the court that the district court judge actually reviewed the evidence and found, I think in the last pages of her summary judgment order, that the evidence was insufficient to go ahead and show that there Everything that they focused on in terms of the bad faith came about in the claims stage when it was under investigation and some disputes that they had concerning the scope of the investigation. Let me ask you this. I know you argued it's a matter of evidence, but simply as a matter of law, is the release temporally agnostic? In other words, does it say it's limited to one time period or another time period, or does it release all claims? No, sir. It releases all claims. It does not have a specific limitation anywhere along the way. And regarding bad faith, was there any bad faith that, in other words, as I understand Florida bad faith law, and I am nowhere near the world's expert in the area, it only accrues at the time that an excess judgment is there, whether on a first party or third party, right? Not necessarily. The answer is no. You can have bad faith that comes up even in the claims stage by failing to tender. That's in terms of liability, but in terms of ripening the claim. In other words, the claim doesn't ripen under Florida law, as I understand it, until a judgment is entered. Until then, you have to determine whether there's coverage or not, right? Right. That's partially correct. There are certainly cases that address that. You can have a case that ripens if, in fact, there was bad faith during the claims process. So that could be ripened in that, for example, if, in fact, a- Counsel, your argument has expired. I'm sorry, Your Honor. A claim could accrue prior to that. And again, there are various species of bad faith law, so I'm hesitant to make a broad statement in that regard. But I think from this standpoint, this one has accrued. Thank you, Counsel. This is Judge Anderson. If I might follow up, it is my understanding, and I certainly am not an expert, not nearly as much as Judge Luck, I'm sure, on Florida bad faith law. But it is my understanding that the particular bad faith claim being made here, the third-party bad faith claim, would not actually accrue until the excess judgment was entered. And my question when I asked you to address the merits of it was to- I think the answer is that the express provision in this release that it includes, expressly includes a bad faith claim, that almost necessarily means it includes this kind of bad faith claim, which, even if there's some others, this one is certainly the most common kind of excess, kind of bad faith claim where the insurance company is held to and the wrongful death cases are a good example that a release can pretty obviously, under Florida law, can release a wrongful death claim. In other words, if the deceased entered a release prior to death, then there simply is no wrongful death claim. So that it seems to me on the merits you win, and actually it's waived anyway, is what my thinking is, am I off base anywhere? No, sir. I agree with the court's assessment. This is the most common form of bad faith claim, and certainly this does specifically release bad faith. And so to say that, you know, we can parse it and cut it up and do it over different times, to use Judge Luck's term, that it was agnostic in terms of the timing of that, or temporarily agnostic, is correct. So if the release covers all the actions, I would submit that is the way in which this needs to be interpreted. All right. Thank you. Nothing further. Thank you. Thank you, counsel. Just want to check. Judges Luck and Anderson, did you have anything else you wanted to ask? I do not, Judge Anderson. No, thank you. All right. In that case, we will hear five minutes of rebuttal from Mr. Ambler. Thank you. May it please the court. First, I would agree with Judge Luck and Judge Anderson's the claim does not ripen into a third-party bad faith claim until the excess judgment is entered. And to that extent, the diagnostic leasing or DLI's position as a claimant bringing a third-party bad faith claim under the statute 624.155, the statutory bad faith action, is a separate cause of action from that of the insured, even though they may derive out of the way the insurer handled the claim. But what we're talking about in terms of handling the claim is the failure to settle the claim when the insurer could have and should have done so under the circumstances. And so I would submit that even if the release applies, and I'll come back to that point in a minute and conclude on it, but even if it applies to blocker as a release, the insured, it does not apply to diagnostic leasing. We take issue with the reading of the law that diagnostic leasing's claim is derivative here. And I'll cite to the court, to McCullough versus government employees, the Supreme Court's answering of the certified question posed by the 11th Circuit at 953 Southern 2nd, 451, a pin site of 458, where the court said, further, the essence of a third-party bad faith cause of action is to remedy a situation in which an insured is exposed to an excess judgment because of the insurer's failure to properly or promptly defend the claim. And either, and the court goes on to say, where the underlying tort action against the insured no longer exists, either because the insured party has released the insured from liability, or the underlying judgment has been satisfied, the cause of action for third-party bad faith no longer exists. Neither of those circumstances are present here. The injured party, diagnostic leasing is the claim that did not release Blocker, and Blocker never offered the policy limits, neither did their insurer. And that's the point, the limits were never offered at any point. Counsel, none of that, none of what they said in McCullough, which dealt with the statutory notice under the statutory bad faith claim, it had nothing to do with the derivative nature of the third-party claim, is inconsistent with a slew of Florida cases stating that the third-party claims, while an independent cause of action, are derivative of the claims of the first party, and they step in the shoes of the insured. How is what McCullough says inconsistent with that? It steps into the shoes of the insured in the context of the duty of the insurer to act fairly and reasonably and settle when it could have, it should have done so under the circumstances, not step into the shoes of the insured in the sense that, in the role of the assignee, certainly they would be released if, in fact, Blocker is released as its assignee, they are released. But as a separate third party, as a cause of action, as an injured party, under the statute, under 624.955, if you were to hold the derivative nature of that, then they would eviscerate the independent cause of action that the insured has by claiming that the insured did not treat its insured fairly and appropriately under the statute. That's the derivative nature in terms of the duties that were owed by the insurer to the insured, but not derivative in the context that if the insured has signed a release of its first party rights to bring a third-party claim, that it eviscerates a separate third party's right to bring its own third-party claim. And I think that those, that's the distinction, and that's a big distinction. But I'd like to come back to that because I only have a minute left about the release itself. Two points very quickly. I think that the, that AIC has misspoken perhaps because it's saying that AIC is a subsidiary of Fireman's Fund. That is not what the evidence showed. In fact, the evidence the below is that these are separate entities, AIC and Fireman's Fund Insurance Corporation are separate entities that operate under the trade name of Fireman's Fund as their moniker, much like AIG operates with a group of 30 insurance companies under the moniker of AIG. But in this instance, to the point of whether it was preserved on appeal and tying that into the order what the required evidence must show to establish an agency relationship. And those very points that are correctly cited by the court, which are typically questions of fact to be resolved by the fact finder, the court clearly states in 31 that AIC did not address those elements of agency and failed, therefore restated that they failed to meet its burden. And the court goes on to make some comparisons with the letters that were asked about. All right, may I finish my sentence? Yes, you may finish your sentence. This court has cited to some letters in the record, which were cited by the lower court, but those letters do not make it clear when they're operating under a moniker of Fireman's Fund, not entity, but the umbrella trade name that they're operating under, whether AIC is the agent of FFIC or vice versa. I think the telltale sign is the evidence that AIC wrote the check and it would be the principal writing the check and AIC is the issuer of the policy. Contractually, the obligation runs from AIC to its insured blocker, not from Fireman's Fund Insurance Corporation, who acted in this instance as an adjuster, general adjuster, who then subcontracted for outside adjusters to complete the claim. So, the relationship is exactly reversed based on this evidence in the record that FFIC is an agent of AIC and therefore the release that was signed does not release AIC because AIC is not an agent of FFIC. Thank you very much. We have your argument. Before we go, let me just double check. Judge Locke, Judge Anderson, do you have anything else you'd like to ask? I do not. Thank you. No, thank you. All right. Thank you, counsel. We will be in recess until tomorrow.